I will go ahead and hear argument in the sole case, which is Kivett v. Flagstar Bank, Case No. 21-15667. And just let us know if you want to reserve time for rebuttal. Thank you, Your Honors. Good morning. I would like to reserve three minutes for rebuttal. May it please the Court, Jonathan Ellis on behalf of Flagstar Bank. To determine whether California Civil Code 2954.8 is preempted, this Court must do as Barnett Bank did, and compare the type of interference that this law imposes on national bank powers to the type of interference that was imposed on the state banks. So, Counsel, you started out, do what Barnett Bank did. Shouldn't it be do what Cantero did? Absolutely, Your Honor. And what Cantero instructs is that Dodd-Frank codified Barnett Bank and directed courts to determine significant interference in the same way, in the same manner that the Supreme Court did in Barnett Bank. But the problem, potential problem, I mean, do you see daylight between Cantero and Barnett Bank? I think Cantero described Barnett Bank's methodology in a way that perhaps courts, lower courts, had not recognized before the Cantero decision. It did, of course, hold that Dodd-Frank codified Barnett Bank. So what's different between Cantero and Barnett Bank? I don't think anything is different between Barnett Bank and Cantero. I mean, that's what the Court said. If there's no difference, how does this panel have the right to overrule a prior panel? But I think what it did do is articulate what Barnett Bank did in a way that lower courts had not always followed, and I think in a way that the Luznak decision did not. And that's the nuanced assessment of the prior cases? That's right. What did the Court think we were doing? In Luznak? Well, in any of these cases, Barnett Bank is codified by name in the statute. We recognize that. We cited Barnett Bank. And the reason I'm asking the question in this way is this panel has two questions before it. One is the question that your clients are most interested in, is this preempted? But our panel has to struggle with the second question, which is, is Luznak so inconsistent with Cantero that we have the right as a three-judge panel to overrule a prior three-judge panel? It's a second-order question, and it's a hard question. So I think there's two reasons, two things about Luznak that make clear that what Cantero did was to effectively overrule Luznak. The first, I think, is the point we've been talking about, that I think Luznak, although it did certainly cite Barnett Bank and Dodd-Frank and the significant interference standard, it did not apply the methodology that Cantero instructed lower courts to apply. And that methodology is what? It is the nuanced comparative analysis of the cases that Barnett Bank, the state law in Barnett Bank and the state laws in the cases in which Barnett Bank cited. Remind me, are there intervening cases after Barnett Bank? I think there are. There are Waters and Cuomo. And when were those issued? As I stand here today, I can't remember all the exact dates. But I wonder if that's another thing that is slightly different, because as I read the test, the test is a very odd test, not crazy, but it doesn't lay out a test to follow. It basically says look at our prior cases and compare them. And were any of those cases – I guess none of those cases were post-Luznak, though. None of those cases were post-Luznak because Barnett Bank was Luznak. But Cantero was. Cantero was. Can I look at Cantero and say, hey, this is another data point that we need to look at for part of the test? Absolutely. You could, and I think you should. If I could, if you look at Miller v. Gammie, I actually don't think – I think this is a pretty consistent pattern with what happened in Miller v. Gammie, the case, of course, that governs the effectable ruling standard. In that case, what this court en banc decided and said is that intervening Supreme Court decisions had adopted a different methodology for determining absolute immunity. Those decisions, if you take a look at them, they're Antoine v. Byers v. Anderson and Kalina v. Fletcher. They, too, from the Supreme Court, purported to be interpreting its prior cases and applying a consistent approach, but they articulated it in a different way. They laid out a different methodology. What they said is although this court's prior panel decision had looked at the relationship of the individual for absolute immunity to the judicial proceedings, these subsequent Supreme Court cases, intervening Supreme Court cases, had said that the right way to go about determining absolute immunity was to look at the functions and compare that to the common law. Again, that was not a recognized departure from the Supreme Court's previous cases. It just articulated it in a different way, and when it got to this court in Miller v. Gammie, this court en banc recognized that that's a different approach, that Babcock, the prior decision, hadn't followed that methodology. And so the court needed to follow that new methodology afresh. And I think the court should do that here.  Does Cantero relieve us of the responsibility of using other statutory, other tools of statutory interpretation? I think it instructs how the 25b is to be interpreted and applied. Is there anything in Cantero that tells us, for example, that we should not look at TILA? It does not say that, Your Honor, although I will point out that it does. TILA was before the court, 1639d.  It's in the footnote. In the footnote, and the court didn't rely on it. That's another way of fulfilling our responsibility of trying to figure out preemption is to look at, is to use other tools of statutory interpretation. So is there anything inconsistent in Cantero between this nuanced view of prior cases, which doesn't seem to be a particular departure from anything that we do, and being able to use other tools of statutory interpretation to inform us? No, I don't think so. But I actually think that what is in Cantero suggests that the way that this Court understood 1639d and how it bore on the significant interference standard was incorrect. And let me, if I could, I'll explain why. What the Court said in Cantero is that when you're asking and doing this comparative analysis, what you should look at is the text and structure of the laws, its prior precedents, and common sense. And you should compare, and specifically, the kind of interference that was at issue. It was not an empirical sort of factual showing of burden, not asking about the financial burden. It made clear that federal courts could comply with state law and federal law. It's the kind of interference, the kind of law, that's at issue. So if you look at 1639d-g-3, in Loznak, this Court looked at that law and said, in TILA, Congress had required national banks, in some circumstances, for higher-priced mortgages to comply with state IOE laws. And it concluded that it must not be the sort of financial burden that's going to be too much on a bank, if that's what is required in some circumstances. And so it could be required in all circumstances. But if you're asking about the kind of interference, I think that the understanding goes exactly the opposite way. I think what the 1639d-g-3 says is in some circumstances, state law can apply, but then it leaves flexibility for banks to determine how it's going to pay interest on escrow, for mortgages that don't fall under TILA, the mortgages like the ones in this case. And when you look at a case like Fidelity, that was one of the ones cited in Barnett Bank, and the Court expressly called it out in Quintero, that sort of flexibility, where a federal law has preserved flexibility, and then a state law comes in and tries to limit it, is exactly the kind of significant interference that is not permissible under a Barnett Bank, and therefore under Quintero. But Fidelity just doesn't seem to be terribly useful, because you're expressly preempted by a regulation that the Court says the Federal Home Loan Bank Board had the power to issue. It would have been far more analogous here if the Court had taken up the regulation adopted by the OCC. So I don't think that's the right way to read Fidelity in light of Barnett Bank and Quintero. If you look at – I recognize – Would the law have been preempted in Fidelity if there had been no regulation? I don't know exactly, but what I can say is – But that would be a completely different case, wouldn't it? If you look at Barnett Bank in the way it describes Fidelity, and look at Quintero in the way it describes Fidelity, it doesn't focus on any sort of express conflict. Indeed, Barnett Bank and Quintero both make very clear that both enumerated powers and incidental powers, those not express, are ordinarily preempt state law, and ordinarily are not subject to restriction. And they don't mention in Quintero or Barnett any sort of express conflict at all in Fidelity. And so I think what's important from Barnett Bank and Quintero is that federal law had maintained flexibility for banks, and that the California law in that case attempted to limit it or take it away. If you look at TILA, I've already described that. I think RESPA itself and REGEX, as the Quintero Court recognized, extensively regulate escrow accounts and don't require interest on escrow. I want to go back to part of the test, my favorite part, the one that says to apply common sense.  Which is as nonspecific as you can get. So where is the common sense in saying in the Truth in Lending Act, it's not an interference, expressly stated by Congress, to require interest on escrow accounts. These are presumably because they're mandated for these higher-priced mortgages. But it defies common sense to require national banks to do it when they require an escrow account on a regular ordinary mortgage. So I'd offer you a couple different thoughts on that, Your Honor. The first, I think, is that really, as I say, it's not about the financial burden. It's about whether Congress has authorized this sort of interference with national banks. And I think the common sense and the ordinary way of reading a statute is when it calls out one section, one category of cases where state law will apply, that implies that state law should not apply in others. Take, for example, Section 85 of the National Bank Act. That's a provision that applies state interest caps in some circumstances to national banks. But I don't think anyone thinks that Section 85, because it allows state law interest caps to apply in national banks in some circumstances, means that applying state law interest caps in other circumstances wouldn't be a significant interference. Indeed, I think the inference goes exactly the other way. You raised the other point that I wanted to get your comment on. The amicus brief on your side from the Bank Policy Institute seemed to focus its argument on the mandated 2% and saying that that was the interference. It didn't seem to suggest requiring interest on escrow was the interference. It was mandating what they argue is an excessive interest rate if you look at the recent history of interest rates. I take it that you don't adopt that view. We do not. I do think the 2% interest rate makes the interference here particularly egregious. At times, that is many, many times the market rate for a savings account, and indeed it was during the relevant period here. But our argument doesn't depend on the interest rate. It depends on the kind of interference that it is setting and dictating a core financial term of a bank's products. Let me go back to common sense one more time. In the briefs, it talks about that Flagstar Bank services loans that it didn't make, and then it has approximately 20% of the mortgages that it makes that are at issue here, and that you pay interest on the escrow on 80% of what you service, but not on the 20% that you're servicing and originated. Does common sense suggest that if you can pay interest on escrow on 80% of them that there's not a whole lot of interference with your national banking powers? Again, Your Honor, I think that's the wrong way to think about significant interference. It says over and over again in Quintero that the test is the kind of interference that was found to be preempted in Burnett Bank and its cases that it relied on. It's not about the financial burden. It's not about the economic burden. Indeed, again, both those cases all made very clear that the banks could reply with state and federal law. Indeed, if I could talk about Franklin for a moment. In Franklin, what the courts below said and the proponents of the state law said is this must not be a significant interference because every other bank in the state is complying with this law, and they're thriving. Indeed, Franklin National Bank had complied with the law for a period of time before it decided not to, and therefore it must not cause significant interference. But then the Supreme Court reversed, right, and it did not look at the financial burden, the economic burden that it imposed. Instead, it said this is just the kind of interference that when you try to dictate the terms of a national bank's advertisements, that's out of bounds. And if that's a paradigmatic example of significant interference, which is how Quintero described it, then it must be a significant interference for a state to purport to set and dictate the core financial terms of the banking's product itself, not just its advertisements. I have some more questions. Don't worry. We'll give you some time for rebuttal. But there's no way to rule for you and say that this is preempted unless we either take less neck on bonk or say that it's clearly irreconcilable with Quintero, correct? That's correct. Okay. I looked for a way, and I didn't find one, so I just wanted to confirm that. Yes. Let's go back to Franklin for a minute, because I think Franklin is probably the best case for you. I think it's probably got the broadest language and it's a much better case than Fidelity Federal Savings and Loan. One way of looking at Franklin, adverse to you, because I think there's lots of language in there that is very helpful to you, but one other way of looking at it that might not be helpful, so I'm going to ask how you help us distinguish this, is that what New York had done was discriminate against certain kinds of banks. And so it is discriminating. It's an equal opportunity discriminator. It is discriminating between savings and loans and mutual savings banks on one side and other banks, including New York State chartered banks that wanted to offer interest on savings loans. So in that sense, it looks like it really is discriminating. It's choosing winners and losers between banks. And although some of them, it's not a perfect discriminator against federal banks, which would have been just a flat violation of the preemption laws. It's one way of characterizing that, and the court didn't like that. And the court has a footnote at the end in footnote 7 that says, you know something? This does not mean that states can't regulate banks, federal banks, in other ways. So how do you deal with that argument? Yeah, so I think the answer is really banked into the premise of your question or acknowledging the question that what is separately preempted are discriminatory laws on national banks, right? But as you point out, the law in Franklin was not discriminatory against national banks. Indeed, the appellate division made that clear. It does discriminate against all national banks. It also discriminates against some state banks in favor of other state banks. And so what I'd say is that the appellate division took up that argument and rejected the discriminatory argument as a grounds for preemption. And then when you look at the Supreme Court's decision, the U.S. Supreme Court's decision, it does not depend on that discrimination. Instead, what it depends on is the nature of the interference, right? It says that you're putting a burden on an incidental power here, the power to advertise, and that burden is significant. It is of the kind, the nature and degree, that is not permissible under Barnett Bank, not because it distinguishes between commercial banks and savings banks, but because it is an important aspect. It really goes to what you need to do to advertise these accounts. And again, I think if you're talking about a state law that takes one word off the table, right, for advertisements of savings accounts, and that is a paradigmatic example of significant interference, then it must be that a law like this one, that it's not about advertising that's at the core. It's about the terms, the financial terms of the product, and sets the interest rate. It's the same as if the state law, California law, had come in and said, you must pay a 3% interest rate on your savings accounts, or you must not charge ATM fees higher than $2. There may be reasons to be doing that, but that's inconsistent with the dual banking system and the competitory regulatory scheme that Congress has established in the National Bank Act and that the Supreme Court just emphasized in Quintero. It's that kind of interference that we say is out of bounds for states, and I think it's really true here. One question, and we'll sit down. The Quintero in the Second Circuit and Conte in the First Circuit, is there any update on either of those cases? They've both been argued, Your Honor, fully briefed and argued on Quintero, on remand, and then Conte. Was Conte also vacated and sent back? Conte had not been decided. Oh, they just held it. That's right, pending the Quintero. So they were argued in the last month, as far as I know, last I checked that neither one had been decided.  Thank you. We'll give you a couple minutes for rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, my name is Peter Fredman. I'm counsel for the Plaintiff Appellees, the class of Flagstar mortgage customers. I'd like to reserve three minutes for rebuttal. As you know, we were last here three years ago. At that time, Flagstar was contending that significant interference was a question of fact, perhaps strategically so, but that was what happened. Thus, this case was decided with evidence on cross motions for summary judgment. Though the ultimate judgment was ultimately entered and affirmed based on the precedent of Looseneck. Counsel, let me start with the question that's on my mind. If we apply Cantero, I feel like we get to a different result than what Looseneck reached. I take it you don't agree with that. So explain to me why you don't agree with that. As I read Cantero and Barnett Bank, the Barnett Bank standard is you look at the two laws and you see if they conflict. And in all the cases, with one possible exception, in Franklin, the main cases, Franklin Fidelity and Barnett Bank itself, the two laws just flat out conflict with each other on their faces. So you can look at those laws and make an evaluation of whether the state law significantly interferes with the federal law or not. This case is more like Anderson. There is no explicit federal power that it conflicts with. It's a question of degree. And at that point, you have to look at the likely effect. What is the effect of the state law on the federal law? And in this case, we know the effect because we have all this evidence, and the effect is it doesn't interfere. Compliance with Section 2954.8 doesn't interfere with banking. So the Supreme Court asked for the Solicitor General's views in Cantero, and the Solicitor General came in and said expressly that Losnack was wrongly decided. It couldn't be squared with prior Supreme Court precedent. It seems like the Supreme Court, I mean, they didn't say anything about that specifically, but in ruling and adopting the Solicitor General's argument, isn't the Supreme Court almost implicitly saying that Losnack had to be incorrectly decided? No. I think the Supreme Court bent over backwards not to overrule Losnack. Losnack was central to the Second Circuit's opinion in Cantero. It's all over the place, and the Supreme Court just stayed completely away from it. And I think that's also the reason they didn't touch our case because they didn't want to decide. They didn't want to overturn Losnack. They just wanted to develop some parameters. They adopted a rule that the Solicitor General was advocating for, and the Solicitor General said if you adopt this rule, Losnack has to be wrongly decided. So I get it. The Supreme Court rarely, they've done it before, but rarely have they reversed a decision without having it squarely before them. So I understand they didn't expressly say this. That's why we're here today. But I just don't understand how you can segregate out this idea that the Supreme Court is taking a position that seems like everyone, the Second Circuit, the Solicitor General, everybody agrees, is inconsistent with how we decided Losnack. Can I ask for a little clarification on what the rule is? You say the Solicitor General. Well, the Solicitor General was asked about Losnack. I mean the Solicitor General said, if you go back and apply what the Supreme Court did in Barnett Bank and you look at the test that's been adopted and prior and subsequent Supreme Court precedent, Losnack doesn't fit within that. Losnack is inconsistent with that. With respect to 1639D? Yeah, well, with respect to the level of interference that is normally required for preemption, to find preemption. I mean, maybe I'm catching you off guard. Were you aware that the Solicitor General had made those comments? Sure. I've listened to the argument twice. I didn't go to the – my case was up there at the Supreme Court, not in McBanham. So I did listen to it twice, and I didn't pick up the same thing. I do feel like the solicitor felt that Losnack overplayed 1639D, but I didn't get that it was – that there was an adoption of an opinion that said that was flat out wrong. So the court called for the views of the U.S. Solicitor General, and the U.S. Solicitor General in their brief – I guess I can't speak to what was said in the argument – but in their brief, they said that Losnack erred in treating Section 1639D as determinative of the preemption question. I guess it's fair. Maybe they didn't go so far as to say Losnack reached the wrong result, but they did say that the analysis was – Yeah, I don't think Losnack treated 1639D as determinative. It was the final straw. It was the absolute – you know, the final indicator of congressional intent. But the fact that Wells Fargo, the biggest mortgage servicer in the country, was paying interest on escrow was a big consideration. The fact that there was no conflicting explicit power that the interest on escrow law conflicted with, that was a big consideration. So 1639D, they liked it. I agree with Losnack that 1639D does show some congressional intent that these types of laws – Well, and just to put another finer point on it, the Solicitor General also said Losnack elided the practical degree of interference assessment that Dodd-Frank requires. And it makes me wonder – you know, we asked about the difference between Barnett Bank and Cantero. One of the differences is that Dodd-Frank was intervening there, right? Because Dodd-Frank comes in in 2010, and Cantero is the first case – well, I don't know if it's the first case, but it's the most recent case after Dodd-Frank. And so doesn't that suggest that we need to revisit this question in light of Dodd-Frank? I think Losnack was the first circuit court case. I agree. Well, I don't know about the first, but clearly Losnack was post-Dodd-Frank. Well, to interpret this provision, we're talking about a particular provision of Dodd-Frank that's designed on its face to protect state consumer financial laws against preemption. So Losnack was the first case to look at that, the first published circuit court case, I think. And Cantero is the first published Supreme Court case to look at that. Now I've lost sort of track of the question. Let me reorient it this way. If the Supreme Court comes down with an analytical framework that is different than what the Ninth Circuit has previously said, aren't we bound to follow the analytical framework in the Supreme Court case? I don't think the idea of citing, of looking at the precedent of Barnett Bank and the cases it cites is a unique analytical framework. I do think it's sort of a path that Cantero is suggesting can be taken if you don't have a record on, you know, in order to look at these cases on a motion to dismiss. But I think if you take that path in our case, you see that there is no actual conflict. It's just an implied conflict. Let's see, and then I'll let my colleagues ask questions, but just one more question on this. If we apply what we see as the analytical framework in Cantero and we would reach a different conclusion in Losnack, does that in and of itself mean that it's clearly irreconcilable, or do you think that Supreme Court precedent could dictate a different result but it's not clearly irreconcilable with the prior precedent? I think the Supreme Court methodology, the expanded Supreme Court methodology, is flexible enough to take Losnack into account. So Losnack looked at, remember, what was happening with Losnack is the Bank of America was still writing on its 2011 preemption determination from the OCC that Losnack threw out. Losnack covered a lot of ground. Losnack got us here. A lot of what Cantero does is stuff that Losnack did and is now sort of taken for granted. We're not talking about OCC preemption rulings post-Dodd-Frank, and we're not talking about Skidmore deference. All those things are past because of Losnack, and then Cantero just sort of built on it, which is sort of how the law often works, I think. So if the question is, if I'm telling you as a fact that I would, if I look at Cantero, it leads me to a different result. If I leave out Losnack, I don't think you should leave out Losnack. I think you need to take the fact that Losnack looked at this law and the factors it looked at and found no significant interference, that itself is an indicator of no significant interference. You know, it's a panel of the Ninth Circuit. They looked at what was before them, which wasn't yet this nuanced comparative analysis. They just looked at what was before them, and they came to the conclusion they did, and that's significant because, in the end, somebody has to decide if there's significant interference. I want to hear your view on the facts and whether the facts are important or whether this is something that, rather than being decided on a motion for summary judgment, which it was on a full record, could have just as easily been decided on a motion to dismiss. Is the factual development significant for the Cantero analysis, or is this a more theoretical... It doesn't really matter what the facts are. We're looking at these statutes and seeing if there can be a significant... or if there is a significant interference, as opposed to looking at what practically is happening out there with banks. Well, the Cantero... The real Cantero methodology is to make a practical... You must make a practical assessment of the nature and degree of the interference. That's... The standard is the same standard as Barnett. Bank, you know, prevent or significantly interfere. The methodology is a practical assessment. The word practical itself means, you know, concerning the actual doing or use of something and not theories or ideas. And so I think there's a... I think practical overrides... Overrides... You can't have an idea come and override a practical fact under Cantero. That shouldn't be available. Now, what they did... So the way I see it, the way we would analyse it, is when you have that stark conflict, you can just look at the two different texts of the law and decide which is... whether there's, like, you know, significant interference. But in a case like Anderson, and juxtaposed against Bank of San Jose, you have to sort of re... You know, if you're not going to get a factual record, you have to sort of reach some conclusion about the likely effect of the state law on the federal law. And that's what they did. And then you decide if that likely effect is significant interference. I do think, given what 12 U.S.C. 25B says and what Cantero says about a practical assessment, there will be situations where you need some kind of record, maybe not a purely factual record, but, like, a mixed question, an evidentiary hearing or summary judge, cross motions for summary judgment, something to... In those... In the non-prima facie conflict cases, the courts may need something to make their decision on, and that's built in... That seems to be built into the 12... 25B, and it seems to be built into Cantero. I don't think there's a rule in Cantero you can never look at the facts. You have to throw away the facts and rely on theory and ideas. I think practical assessment means the opposite of that. Thank you. Should I just reserve? Well, there's no reserving. I mean, the more you argue... You don't get the luxury of a sir rebuttal. OK. You can tell I really know what I'm doing. No, you're helpful. Thank you. So we've talked about the facts. I do want to... I'll take my last 38 seconds to just address one little point, which is that mortgage escrow accounts are not savings accounts. They're not deposit accounts. They're not banking products. They're not voluntary. They're funds that arise out of adhesive provisions of the deed of trust. The contracts... In California, they're called deed of trust. They're the contracts that secure the real estate collateral to the loan, and they're the contracts that allow lenders to foreclose. And so we can see why, you know, why the banks want to analogize, you know, mortgage escrow accounts to savings accounts, but there's really no... It's not a valid analogy, particularly under the rule described at 25B, we have one of the... We're fortunate we have a record in this case. We can look at it. At ER 73, we have the Bravo deed of trust, and at Section 3, it describes the escrow provision, and it says that we get to pay your taxes and insurance for you, and we get to collect the money up front and hold it and pay it, and we don't have to pay interest on it unless applicable law requires us to pay interest. And all these deeds of trust, most have that language I just described. All of them are going to say they're governed by applicable law. And remember, these deeds of trust, they change hands, they move around. Not every holder of a loan is a bank. So they make... You know, whether or not... We know that most of the time interest is paid in states where the law requires it.  Okay. I think we've got your argument. Okay. Thank you. Thank you. Thank you, Counsel. We'll give you two minutes for rebuttal. So if I could, I just want to make one point about Lesnack and then a couple points about Cantero. On Lesnack, I do think that the history of this litigation is relevant, as you point out, Your Honor. The SG, in fact, did reject in its CVSG brief the Lesnack analysis. It said on page 19, the Ninth Circuit and Flagstar and Lesnack thus failed to make the practical degree of interference assessment that 25B1B requires. But what do we do with that? The Supreme Court didn't... I mean, they adopted the SG's argument overall. I mean, I think that's a fair inference. But they didn't say anything about this. They could have. So do we really... I mean, I just don't know how much to make of that. It's relevant, but I don't know if it's dispositive. I think the other point that's relevant is that the court then turned around and granted our petition, vacated the last decision, and remanded. Yeah, but they do that a lot. I think what you gain from that is we don't want to deal with this now, which is fair use of their resources. We do rest primarily on the methodology distinction. I think that's the key under Miller v. Gammey. But I don't think that it is all that usual. Indeed, I think it is unusual for the court to take two cases from opposite sides of a split to then reverse the other side and then GVR both sides. Yeah, but the Second Circuit was a categorical decision, really based on McCullough rather than anything that was in Barnett Bank. I'm not arguing that this court should adopt the Cantero approach. I think it's the Second Circuit's approach to Cantero. It obviously isn't. I do think it would be particularly odd in that history, with the SG's brief, with the GVR, to then not apply the Cantero methodology with fresh eyes. Well, and I guess the question comes back to can we do that as a panel or do we need to ask for the en banc court to do it? And I think the key there is the point I made before, that the Supreme Court in Cantero adopted a new methodology that this court did not apply. That's what the SG was saying. And that's exactly the instance in Miller v. GAMI in which the prior panel decision had been overruled. So one procedural point. So neither Cantero nor Conte has been decided yet by those courts. Did the Second Circuit in Cantero deal with Fannie Mae v. Lefkowitz, the 1975 decision? That's a three-judge constitutional court. Right. I don't recall if it did. I don't think that has much bearing here. Obviously, it's not. It's not binding on us, but it should have been binding on them. I mean, under our rules, it would have been binding on us. I think the key is that that case actually didn't concern National Bank Act preemption at all. It was about Fannie Mae, not about a national bank. It did, of course, analogize to Anderson. But then it actually pointed out distinctions, right, that the law in New York was applying to Fannie Mae, not the national bank. So it was imposing interest on escrow requirements on the acquirer of the mortgage, not on the bank itself. So I actually don't even think that would be applying. I think it's just a different situation than what we're facing here. What is your view, in light of Cantero, of the factual record that was developed for this case before the district court? That was one of the two points I wanted to make about Cantero. We do not think that that factual record is relevant here. I think if you look at Cantero, you look specifically at footnote 3 about what the court is saying, how this analysis should apply, nothing about that suggests that a factual record is relevant. Indeed, what it says is do what Barnett Bank did. And if you look at Barnett Bank, at Fidelity, at Franklin, at Anderson and McClellan, and at Commonwealth, not a single one of those is relying on a factual record or suggesting that a factual record is relevant. I think Franklin is the key there. There actually was a factual record like there is here, and yet the court mentioned it in the procedural history. It knew it was there. And then in the analysis, it said not a word about that factual record. And I think that's for a good reason. I think it's an unworkable preemption system that relies on a factual record. I think you've got two ways for that to play out. Either you're going to have preemption that varies from bank to bank depending on the record that a bank puts together in a case, which I think no one in the court or in Congress thinks is the right way to go about it, or you've got a preemption decision that's going to bind all national banks that depends on the factual record that one litigant puts together. I can't think of another spot in which a preemption analysis turns that sort of factual record. I think it would be an odd thing to do in this circumstance, specifically in a case where the law is intending to create a uniform national rule for national banks. Is that a change of position from what Flagstar had below, though? It absolutely is a change of position from pre-Luznak, of course. And, of course, we flip sides. You can look at their brief. They say it's clearly a legal determination. The reason for that, of course, is that Luznak was the law of the circuit when we were here last. We were trying to figure out a way to distinguish Luznak on those grounds. Post-Cantero, we don't think we need to do that anymore. As we've discussed, Your Honor, I think that Cantero just effectively overrules Luznak, and now we're trying to apply Cantero here. Okay. Thank you. Thank you to both parties for your arguments, and the case is now submitted. And that concludes our arguments for today. Thank you, Your Honor. All rise.
judges: BYBEE, NELSON, Bolton